[Cite as *Morse Rd. Dev., L.L.C. v. Centerville*, 2025-Ohio-5066.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| MORSE ROAD DEVELOPMENT LLC, ET AL. | : | C.A. No. 30387 |
| | : | |
| Appellees | : | Trial Court Case No. 2023 CV 06256 |
| | : | |
| v. | : | (Civil Appeal from Common Pleas Court) |
| | : | |
| CITY OF CENTERVILLE OHIO, ET AL. | : | |
| | : | **FINAL JUDGMENT ENTRY &** |
| Appellant | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on November 7, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
MICHAEL L. TUCKER, JUDGE

EPLEY, P.J., and HANSEMAN, J., concur.

## OPINION
MONTGOMERY C.A. No. 30387

JESSICA E. SALISBURY-COPPER, JAMAR T. KING, and JUSTIN T. ELKIN, Attorneys for Appellant

DEREK L. MUNCY, JAMES H. GREER, and JAREN A. HARDESTY, Attorneys for Appellees

TUCKER, J.

{¶ 1} Graceworks Lutheran Services appeals from the trial court's reversal of the Centerville City Council's denial of a site-plan application filed by appellees Morse Road Development, LLC, Sheetz, Inc., and Hemmert Far Hills Properties, LLC.

{¶ 2} The site-plan denial prevented the appellees from constructing a combination Sheetz gas station, convenience store, and restaurant on commercial property in Centerville. The trial court reversed the City Council's decision and remanded with instructions to approve the application.

{¶ 3} Graceworks contends the trial court applied an incorrect definition of "surrounding properties" to find that the proposed facility would be consistent with the use and character of those properties. Graceworks also claims the trial court applied an incorrect standard of review to find that the proposed facility was consistent with the use and character of surrounding properties. Finally, Graceworks asserts that the trial court erred in reversing the City Council's decision where the site-plan application failed to satisfy other requirements in the applicable ordinance.

{¶ 4} For the reasons set forth below, we find Graceworks' arguments to be unpersuasive. Accordingly, the trial court's judgment is affirmed.

# I. Background

{¶ 5} Graceworks operates a large retirement community on Far Hills Avenue in Centerville. Sheetz is a corporation that owns combined gas stations, convenience stores, and restaurants. Morse Road Development is a land developer. Hemmert Far Hills Properties owns real estate located at 6318 Far Hills Avenue in Centerville. In the summer of 2022, Sheetz contracted with Hemmert to purchase the real estate, which is directly east of Graceworks' retirement community across Far Hills Avenue. Sheetz intended to raze the existing Elsa's restaurant on the property and redevelop it with a Sheetz facility.

{¶ 6} The property at issue sits at the southern end of a "B-2" General Business District. Centerville's applicable code, the Unified Development Ordinance ("UDO"), provides that "[t]he intent of the General Business District is to provide an appropriate location for retail, office, service and administrative establishments required to satisfy the needs of the overall community." The B-2 zoning district also is "intended to provide accommodations, supplies, sales and services to the motoring public." All of Sheetz's planned uses of the subject property were allowed under the UDO. "Permitted uses" are allowed in a zoning district "subject to the restrictions applicable to that zoning district." The code provides that a permitted use "shall be allowed as a matter of right in a zoning district."

{¶ 7} While Sheetz's planed uses were allowed in a B-2 zoning district, the UDO also required submission and approval of a "major site-development plan." In late 2022, the appellees submitted their plan to the Centerville Planning Commission. The proposed site plan provided for demolition of the existing building and redevelopment with a convenience store, restaurant, and gas pumps. Under UDO 5.09(N)(2), the Planning Commission was required to evaluate the site plan to determine six things:

a. That it fully complies with all applicable requirements of the UDO;

3

b. That it fully complies with an approved Final Development Plan, if applicable;

c. That it adequately protects other property or residential uses located on the same property from the potential adverse effects of a non-residential use;

d. That it is consistent with the use and character of surrounding properties;

e. That it provides safe conditions for pedestrians or motorists and prevents the dangerous arrangement of pedestrian and vehicular ways; and

f. That it provides safe ingress and egress for emergency services.

{¶ 8} After reviewing the appellees' submission and a detailed staff report, the Planning Commission voted 5-0 to approve the site-plan application with 15 conditions. The staff report upon which the Planning Commission relied addressed each of the six criteria. Regarding the fourth consideration, that Sheetz's facility be "consistent with the use and character of surrounding properties," the staff report concluded:

> The area along Far Hills Avenue between Loop Road and North Village Drive is characterized as a heavily trafficked mixed-use corridor comprised of commercial, residential (multi-family), and institutional uses. The area north of Fireside Drive is characterized by auto-oriented uses like McDonald's, Mike's Car Wash, and a future Valvoline, along with restaurants like Jimmy John's and the former Hot Head Burritos and future Huey Magoo's. The subject property is located south of Fireside Drive, and this area's commercial uses are less auto-oriented and include residential and community-based uses. Adding a Sheetz on the subject property will introduce an auto-oriented commercial use to the southern portion of the mix-use corridor; however, as shown in Exhibit O, the properties along the west side of Far Hills Avenue are

4

all zoned B-2. The B-2 zoning district's intent and purpose is to provide "accommodations, supplies, sales, and services to the motoring public" (UDO 7.11(A)(2)).

The proposed Sheetz is consistent with the commercial uses north of Fireside Drive. To that point, the Sheetz's architecture and scale will be consistent with those same commercial uses, but less so with the institutional and residential uses to the east and south. The proposed Sheetz is less consistent with the neighboring institutional and residential uses south of Fireside Drive, but the subject property is approximately 3.7 acres and should be able to provide adequate screening so that it can coexist harmoniously with its neighbors. The proposed building footprint is 6,139 square feet and 29' 6" in height and is similar in size and scale to neighboring and nearby buildings. The fueling station canopy will be the first of its kind along this corridor within the City of Centerville but is still a permitted use in the B-2 zoning district. The subject property's size and proposed landscaping should help screen the canopy from neighboring properties. There is a new United Dairy Farmers at 5980 Far Hills Avenue (corner of East Whipp Road) that has a fueling station canopy, but this property is in Washington Township. The submitted architectural elevation drawings comply with the architectural standards set forth in UDO 9.53(C).

August 25, 2023 Planning Commission Staff Report, p. 10-11.

{¶ 9} Nearby residents and property owners filed separate appeals from the Planning Commission's decision to the Centerville City Council. The UDO authorized the City Council to review the Planning Commission's site-plan approval to determine whether it complied

with the criteria in UDO 5.09(N)(2). Following a public hearing, the City Council unanimously reversed the Planning Commission's decision and denied site-plan approval. In its written decision, the City Council made the following factual findings:

1. The property in question is located at 6318 Far Hills Avenue (the "Property").

2. The Property is located at the southern end of a B-2 Commercial Zoning District in the City.

3. Immediately South of the Property is the Appellant Epiphany Church, which also runs a preschool on site and has an outdoor worship area and a memorial garden.

4. Appellant Bethany Village, residential senior retirement community, is the first property located to the West of the Property.

5. A Class One sit-down restaurant oriented to indoor dining customers, China Cottage, is the first property located to the North of the Property.

6. A residential apartment complex, the Villager Apartments, is the first property located to the East of the Property.

7. Epiphany Church, Bethany Village, China Cottage, and the Villager Apartments are the properties that surround the Property (the "Surrounding Properties").

8. The Major Site Plan Applicant intends to develop the Property as a Sheetz convenience store, with a Class Three drive thru/sit-down restaurant and a fourteen-pump fueling station (a "Sheetz").

9. The Major Site Plan Applicant's representatives stated that the site would bring in approximately 3,000 distinct consumer visits daily, in addition to 12-15

6

gasoline delivery truck trips to the site per week.

10. Impacted streets are used for school bus stops and pedestrian traffic.

11. Major site plan applicant's proposed uses (fuel pumps, convenience store, and drive-thru/sit down restaurant) cater to the motoring public and are auto oriented uses.

12. The Sheetz would operate 24 hours a day, 7 days a week ("24/7").

13. None of the Surrounding Properties, and no property within the City along State Route 48 from Interstate 675 to Whipp Road actively operate and are open to the public on a 24/7 basis.

**{¶ 10}** After reciting its factual findings, the City Council referenced the site-plan approval criteria in UDO 5.09(N)(2), focusing exclusively on the need for a proposed use to be "consistent with the use and character of surrounding properties." As relevant here, the City Council found as follows in its conclusions of law:

2. The Major Site Plan Application is not consistent with the use and character of the surrounding properties as required under UDO Article 5.09(N)(2)(d) as reflected in the presentations (including statements, exhibits, and arguments and other submissions) of Staff, the Appellants, the Applicant, and persons offering public comment. These inconsistencies include, but are not limited to, the 24/7 operation of the Sheetz on the Property, and the use being the only auto oriented use south of Fireside Drive; such uses being in contrast to the primarily institutional, residential, and Class One indoor sit-down restaurant uses of the four (4) Surrounding Properties.

3. In reaching conclusion No. 2 above, Council concludes that the 24/7 operation of the Sheetz, by itself and not in combination with any other aspect

7

of the Major Site Plan Application, is sufficient to render the application inconsistent with the use and character of the Surrounding Properties.

{¶ 11} The City Council voted 7-0 to reverse the Planning Commission's approval of Sheetz's site-plan application. The City Council denied the application on the grounds that the proposed development was "not consistent with the use and character of surrounding properties," as required under UDO 5.09(N)(2)(d).

{¶ 12} Morse Road Development, Sheetz, and Hemmert appealed from the City Council's decision to the trial court under R.C. Chapter 2506. Upon review, the trial court rejected the City Council's definition of "surrounding properties" to mean only the four properties adjacent to the subject property. The trial court defined "surrounding properties" more broadly "to include not only the properties that are adjacent to the Property on all sides but also the properties along State Route 48 between Interstate 675 and Whipp Road."

{¶ 13} After defining the relevant area, the trial court held that the City Council could not rely on Sheetz's intended 24/7 operation to find the proposed use inconsistent with the use and character of surrounding properties. The trial court noted that Centerville's code did not prohibit businesses in a B-2 District from operating 24/7. It also cited case law for the proposition that land-use restrictions cannot be extended to include limitations not found in an ordinance. Therefore, the trial court reasoned that the City Council's decision unlawfully placed a new hours-of-operation limitation on Sheetz's proposed facility.

{¶ 14} The trial court next examined the City's Council's other justification for denying site-plan approval, namely Sheetz's status as the only "auto-oriented use" south of Fireside Drive. The trial court observed that the phrase "auto-oriented use" was coined by the Planning Commission and relied on by the City Council but not defined in the UDO. The trial court noted, however, that the UDO did define "Automobile Dependent Uses or Activities"

8

as "land uses that contain automobiles and/or motor vehicles as integral parts of the uses." The trial court applied this definition to the Planning Commission's and the City Council's reference to "auto-oriented use." In so doing, the trial court rejected the City's argument that an "auto-oriented use" is limited to "a business with a drive-through service or services for motor vehicles such as gas stations, car washes, or repair shops, i.e., places that provide service directly to the automobile or to the occupants of automobiles." Under either definition, however, the trial court found that the surrounding properties included auto-oriented uses such as a car wash, an oil-change business, and one or more car dealerships. The trial court also found that "the record does not support the City Council's contention that the proposed Sheetz would be the *only* auto-oriented use south of Fireside Drive."

{¶ 15} Finally, the trial court rejected Graceworks' argument that the City Council should have denied site-plan approval for failure to comply with additional criteria in UDO 5.09(N)(2), including the appellees' failure to protect other property from a non-residential use, failure to address traffic issues, and failure to provide safe ingress and egress for first responders to access Graceworks' campus. The trial court noted that neither the Planning Commission nor the City Council had found that the site-plan application failed to meet these requirements. The trial court also characterized the concerns as speculative and unsupported by the evidence.

{¶ 16} Based on its analysis, the trial court declared the City Council's reversal of the Planning Commission to be "unconstitutional, illegal, arbitrary, capricious, unreasonable, and/or unsupported by the preponderance of the substantial, reliable, and probative evidence, as the City Council exceeded its authority as a quasi-judicial body by improperly taking legislative action in reversing the Planning Commission's approval of Appellants' MSP." The trial court concluded that the "City Council's reversal imposed a condition on

9

Appellants' use of the Property that is not contained in the UDO." The trial court also determined that "there is no evidence in the record that the City Council's decision restricting Appellants' use of the Property bore a substantial relationship to public health, safety, or welfare." As a result, the trial court reversed the City Council's decision denying site-plan approval and remanded the case with instructions to approve the site plan subject to the 15 conditions originally imposed by the Planning Commission. Graceworks timely appealed, advancing three assignments of error.[1]

## II. Analysis

{¶ 17} Graceworks' first assignment of error states:

**The Trial Court erred in applying a broader definition of "surrounding properties" despite acknowledging that the City Council applied the ordinary meaning of the phrase.**

{¶ 18} Graceworks first challenges the trial court's determination that the relevant "surrounding properties" included more than the four properties adjacent to Elsa's restaurant. Although the phrase "surrounding properties" is undefined in the UDO, Graceworks cites Black's Law Dictionary to define "surround" as "to enclose on all sides; to encompass." It then argues that "surrounding properties" for purposes of UDO 5.09(N)(2)(d) clearly and unambiguously meant only the four adjacent properties, namely the senior retirement community, the Chinese restaurant, the apartment complex, and the church. According to Graceworks, the trial court improperly substituted its judgment for that of the City Council by redefining "surrounding properties" more broadly to include a commercial

---

[1] The City of Centerville and the City Council appealed from the trial court's decision under a different appellate case number, Montgomery App. No. CA 30358, and we previously overruled a motion to consolidate the two appeals. The appeal by the City of Centerville and the City Council is resolved separately in a companion decision that follows this entry and opinion.

corridor running north and south along Far Hills Avenue between Interstate 675 and Whipp Road. Graceworks contends the trial court's definition conflicts "with the obvious meaning and intent" of UDO 5.09(N)(2)(d).

{¶ 19} Upon review, we agree with Graceworks that the meaning of "surrounding properties" in the UDO involves a question of statutory interpretation subject to de novo review. *Key Ads, Inc. v. Dayton Bd. of Zoning Appeals*, 2014-Ohio-4961, ¶ 14 (2d Dist.) (recognizing that "the interpretation of a zoning ordinance presents a question of law that requires a de novo standard of review"). We are unpersuaded, however, that the trial court erred in defining "surrounding properties" to include more than the four adjacent properties. Contrary to Graceworks' argument, "surrounding properties" is not unambiguous, as it can have multiple nuanced meanings. The Cambridge online dictionary defines "surrounding" as being "everywhere around something."[2] Merriam-Webster's online dictionary defines "surroundings" as "the circumstances, conditions, or objects by which one is surrounded: environment."[3] The Britannica online dictionary defines "surrounding" as "near or around someone or something" as in "the surrounding area/neighborhood/land."[4]

{¶ 20} In the present case, the relevant "surrounding properties" certainly included the retirement community, the Chinese restaurant, the apartment complex, and the church. At various places, though, the UDO refers to "surrounding properties" and "adjacent properties." We presume that different words in statutes or ordinances have different

---

[2] *See Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english /surrounding (archived Nov. 4, 2025) [https://perma.cc/R9PL-RPVW?type=image].

[3] *See Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/surroundings (archived Nov. 4, 2025) [https://perma.cc/TF4S-ERML].

[4] *See Britannica Dictionary*, https://www.britannica.com/dictionary/surrounding (archived Nov. 4, 2025) [https://perma.cc/6VHK-5Q5T].

intended meanings. When analyzing a municipal ordinance, we must "strive to give 'significance and effect' to 'every word.'" *Willow Grove, Ltd. V. Olmsted Township Board of Zoning Appeals*, 2022-Ohio-4364, ¶ 19, quoting *Wachendorf v. Shaver*, 149 Ohio St. 231, 237 (1948). By our count, the UDO uses the word "adjacent" 125 times. Therefore, we reasonably may infer that the drafters' adoption of the word "surrounding" in UDO 5.09(N)(2)(d) means something other than "adjacent." In our view, the reference to "surrounding properties" in UDO 5.09(N)(2)(d) has a broader geographical connotation.

{¶ 21} Another portion of the UDO supports our interpretation and provides guidance in ascertaining the intended meaning of "surrounding properties" in UDO 5.09(N)(2)(d). In particular, UDO 5.06(D)(1) requires a public hearing when the City Council reviews a site-plan application. Notably, UDO 5.06(D)(2) requires written notice of the hearing to be given "to all owners of property within 500 feet of the subject parcel." It is reasonable to infer that this notice would go to owners of "surrounding properties" given the requirement in UDO 5.09(N)(2)(d) that the proposed use must be "consistent with the use and character of the surrounding properties." Absent better guidance in the UDO, and reading the ordinance as a whole, we believe the most natural interpretation is that "surrounding properties" in UDO 5.09(N)(2)(d) means those properties within a 500-foot radius of Elsa's restaurant. This definition fits comfortably with the dictionary definitions quoted above.

{¶ 22} In opposition to the foregoing definition, Graceworks asserts that (1) the appellees failed to advocate for application of a 500-foot radius in the trial court, (2) the record contains no evidence as to which properties are within 500 feet of the proposed development, and (3) the UDO explicitly would have defined "surrounding properties" to mean all properties within a 500-foot radius if it had intended that meaning. We find these arguments to be unpersuasive.

12

{¶ 23} The appellees' failure to cite UDO 5.06(D)(2) in the trial court is immaterial. The meaning of "surrounding properties" in UDO 5.09(N)(2)(d) was directly before the Planning Commission, the City Council, and the trial court. To help define that phrase, we may look to other portions of the UDO regardless of whether the appellees previously cited them. Additionally, the record does identify all properties within 500 feet of the proposed development. As part of its appeal to the City Council, Epiphany Evangelical Lutheran Church, which sits adjacent to the proposed Sheetz facility, filed a list of all property owners within the 500-foot radius. *See* January 19, 2024 Notice: Filing Transcript of Proceedings, Part 8 of 23, p. 000320 and 000335-000336. A representative of the church swore under penalty of perjury that this list, which had been incorporated into the church's appeal petition by reference, was "true and correct." *Id*. at 000309. In fact, the record before the City Council contained at least two lists of property owners within a 500-foot radius of the proposed development. *Id*. at 000304.

{¶ 24} Finally, we reject Graceworks' assertion that the UDO "would have said so" if its drafters had intended "surrounding properties" to mean all properties within 500 feet of the proposed development. The problem, of course, is that the drafters of UDO 5.09(N)(2)(d) did not define "surrounding properties" at all. They also did not say "adjacent properties" in UDO 5.09(N)(2)(d) even though the word "adjacent" appears 125 times in the UDO. Therefore, we are tasked with determining the meaning of "surrounding properties" as used in the ordinance. To aid in our interpretation, we find it appropriate to consider the fact that notice of the public hearing is sent to property owners within 500 feet of the proposed development. Once again, implicit in this requirement is recognition that these properties constitute the relevant "surrounding properties."

13

**{¶ 25}** In its decision reversing the City Council, the trial court correctly found that "surrounding properties" meant something other than "adjacent properties." In our view, however, the trial court also defined the phrase incorrectly. It concluded that "surrounding properties" meant the four adjacent properties and all properties in the B-2 zoning corridor running north and south along Far Hills Avenue between Interstate 675 and Whipp Road. Applying our interpretation of "surrounding properties" to mean all properties within a 500-foot radius of the proposed development presumably would exclude some of the B-2 corridor referenced by the trial court. Nevertheless, as we explain below, under either our definition or the one applied by the trial court, Sheetz's proposed facility is "consistent with the use and character" of the relevant geographical area. Because the trial court ultimately reached the correct result and properly found that the "surrounding properties" included more than the four adjacent properties, we overrule Graceworks' first assignment of error.

**{¶ 26}** Graceworks' second assignment of error states:

**The Trial Court erred by failing to apply the correct standard of review under R.C. 2506.04 and substituting its judgment for that of the City Council.**

**{¶ 27}** Although the trial court cited the applicable standards under R.C. 2506.04, Graceworks maintains that it erred by misapplying the law, failing to consider all evidence in the record, and ultimately substituting its judgment for the City Council's to find Sheetz's proposed facility consistent with the use and character of surrounding properties.

**{¶ 28}** Graceworks first contends the trial court erred by acknowledging that Sheetz's proposed facility would be the only 24/7 business in the extended B-2 business corridor and then finding that the City Council could not rely on that fact. This argument challenges the trial court's determination that denying approval based on Sheetz's proposed hours of

14

operation constituted an unlawful restriction on land use. In support, the trial court cited *Lamar Co., LLC v. City of Beavercreek*, 2023-Ohio-964 (2d Dist.), for the proposition that restrictions on land use cannot be extended to include limitations not clearly prescribed by ordinance. The trial court further reasoned that "[i]f the City Council, acting in a quasi-judicial capacity, is allowed to make a legislative decision by placing an hours of operation limitation on Appellant's use of the Property when no such limitation on such use is prescribed in the UDO, the City Council would, in essence, be permitted to circumvent the proper legislative process and deny Appellants the use of the Property without due process." In support, the trial court cited *Gillespie v. Stow*, 65 Ohio App.3d 601 (9th Dist. 1989).

{¶ 29} Graceworks claims the trial court erred in precluding consideration of Sheetz's proposed 24/7 operation. Based on our review of the UDO and the case law cited by the trial court, we agree. In *Lamar*, this court recognized that zoning restrictions cannot be extended by implication to include things not clearly prescribed. In *Gillespie*, the Ninth District reasoned that a city council could not deny a conditional zoning certificate merely because a conditionally permitted use proposed was no longer desired in the area. The Ninth District noted that the city council had "determined what uses are appropriate in the C-2 zoned district through council's legislative authority when it originally passed the zoning legislation." *Id*. at 607. Although the municipal code authorized the city council to place conditions on a proposed use, the Ninth District reasoned that "[i]f council is permitted to deny a proposed use which is consistent with the existing C-2 zoning, council, in effect, is rezoning the property without legislative action." *Id*. Ultimately, the Ninth District held that the city council had erred in denying approval because the landowner's proposal to build a mini-mall met all general requirements and all permissible special terms and conditions. *Id*. at 607-609.

15

{¶ 30} Having reviewed *Lamar* and *Gillespie* and examined the language of the UDO, we conclude that the City Council could consider Sheetz's proposed 24/7 operation. Although Sheetz's proposed uses were allowed in a B-2 zoning district, they were not unconditionally "permitted." Centerville's code defines a "permitted use" as "[a]ny use allowed in a zoning district *and subject to the restrictions applicable to that zoning district*." (Emphasis added.) Although the UDO provides that a "permitted use" is "allowed as a matter of right in a zoning district," an allowed use is not a "permitted" one unless it satisfies all applicable restrictions.

{¶ 31} One of the restrictions in the B-2 zoning district obligated the appellees to obtain approval of a major site-plan application. That process involved the Planning Commission's and the City Council's consideration of several criteria enumerated in the UDO, including whether the proposed use would be "consistent with the use and character of surrounding properties." One may question how a use allowed in a zoning district could be inconsistent with surrounding properties, but the present case provides an illustration. The proposed Sheetz facility sits at the southern tip of a B-2 general business district where multiple zoning districts converge. Although a combined gas station, convenience store, and restaurant is allowed in a B-2 district, it is fair to examine whether such a use is consistent with nearby properties, including a church, a retirement community, and an apartment complex with different zoning designations.

{¶ 32} In short, the UDO made the allowed Sheetz facility a "permitted use" only if it satisfied all applicable requirements, including site-plan approval. Given that the UDO expressly prohibits approval of a site plan if the proposed use is inconsistent with the use and character of surrounding properties, the City Council did not impose a zoning limitation by implication or disallow a use that was unconditionally permitted by ordinance. Indeed, the

UDO obligated the City Council to deny Sheetz's proposed use if it found that any of the site-plan approval criteria in UDO 5.09(N)(2) were not satisfied.

{¶ 33} The present case is nearly identical to *City of Colorado Springs v. Securcare Self Storage, Inc.*, 10 P.3d 1244 (Colo. 2000). There an ordinance required a landowner to submit a site plan for a permitted use. A condition for site-plan approval was that the proposed use be "compatible with the land uses surrounding the site." The landowner sought to construct a gas station and self-storage facility. The planning commission rejected the landowner's development plan, finding the proposed uses incompatible with the surrounding residential neighborhood. The city council upheld the planning commission's decision. *Id*. at 1245-1246.

{¶ 34} On further appeal in *Securcare Self Storage*, the trial court reversed the city council's decision. The court of appeals affirmed the trial court, holding that a permitted use cannot be denied on the basis that it is inconsistent with the surrounding area. In essence, the appellate court reasoned that designating something as a permitted use constitutes a legislative determination that it is in harmony with the surrounding area. Given that a permitted-use zoning designation resolves the issue, the appellate court concluded that a zoning body cannot decide whether a permitted use will be allowed. *Id*. at 1246. The Colorado Supreme Court disagreed and reversed the appellate court. Applying the "plain language" of the zoning code, the majority noted that even a permitted use was not an absolute right and that the code gave the planning commission discretion to deny a permitted use based on certain criteria, including a lack of compatibility with surrounding land uses. *Id*. at 1249.

{¶ 35} As in *Securcare Self Storage*, Sheetz's right to its proposed development was not absolute. It was circumscribed by the UDO's additional requirement for site-plan

17

approval, which involved evaluating the proposed use in relation to the use and character of surrounding properties. As part of its "consistency" evaluation, we see no reason why the City Council could not consider Sheetz's intended 24/7 operation. The City Council did not impose an hours-of-operation restriction on Sheetz that was not found in the UDO. The City Council did not prohibit Sheetz from operating 24/7. Rather, it recognized that Sheetz would operate 24/7 and cited that fact as a basis for finding inconsistency with the surrounding properties. Because the UDO 5.09(N)(2)(d) required this type of analysis, the City Council did not impose an unauthorized zoning restriction or effectively re-zone the property. As a result, *Lamar* and *Gillispie* do not establish that the City Council lacked authority to consider Sheetz's planned 24/7 operation.

{¶ 36} The question remains whether Sheetz's intent to operate 24/7 rendered its proposed use inconsistent with the use and character of surrounding properties. The issue below was whether the City Council acted unreasonably in resolving the issue or whether denial of site-plan approval was unsupported by the preponderance of substantial, reliable, and probative evidence. *Wortham v. Dayton*, 2023-Ohio-1767, ¶ 37 (2d Dist.). Unlike the trial court, which was charged with weighing the evidence to determine whether it supported the City Council's decision, our role is more limited. We may not weigh the evidence to assess whether it supported the City Council's denial of site-plan approval. Our review is limited to "questions of law," which includes determining whether the trial court abused its discretion by reaching a conclusion that is unsupported by the evidence as a matter of law. *Id*. at ¶ 38.

{¶ 37} Having reviewed the record, we conclude, as a matter of law, that Sheetz's intended 24/7 operation did not make its planned facility inconsistent with the surrounding properties. On the undisputed facts before us, any contrary determination would be an abuse

of discretion. Thus, although the trial court incorrectly found Sheetz's 24/7 operation to be an improper consideration, the error was harmless. Notably, the trial court also made findings demonstrating its belief that 24/7 operation would be consistent with the use and character of surrounding properties. The trial court "importantly" noted that "the City of Centerville has not made any changes to the UDO aimed at preserving and protecting the character of the community surrounding the Property by limiting the hours of operation of fueling stations, sit-down and drive-through restaurants, or convenience stores." *See* Trial Court's January 7, 2025 Decision, Order, and Entry, p. 13. This finding supports a reasonable inference that the UDO did not consider hours of operation to be a significant factor regarding a business's consistency with the use and character of surrounding properties. Elsewhere in its decision, the trial court again noted that the UDO did not "prohibit any businesses . . . from operating 24/7 in the B-2 district." *Id*. at 14. In fact, no business within the relevant 500-foot radius appears to have an hours-of-operation restriction. In that sense, Sheetz's proposed development is entirely consistent with the other commercial establishments insofar as they all enjoy a right to 24/7 operation.

{¶ 38} An impartial observer might be forgiven for questioning how Sheetz's hours of operation possibly could be inconsistent with the use and character of an area where every other business may adopt those hours. If the existing Elsa's restaurant or adjacent Chinese restaurant decided to stay open 24/7, the tenants of the apartment complex, the members of the church, and the retirement community residents would have no recourse. The fact that nearby businesses currently do not operate 24/7 is less significant than the fact that they all may decide to do so tomorrow. Under the UDO, then, allowing businesses to adopt operating hours of their choice necessarily is consistent with the use and character of the surrounding properties. Given that nearby businesses are permitted to operate whenever

19

they desire, Sheetz reasonably cannot be denied site-plan approval based on its intention to do the same.

{¶ 39} In short, the record establishes that Sheetz's proposed facility is allowed in a B-2 general business district. The relevant surrounding properties include a drive-through restaurant open nearly 24 hours a day some days, a car wash, a car dealership providing repair and maintenance services, and an assortment of other businesses. Like Sheetz's facility, all commercial uses in the relevant area are permitted by the UDO to operate 24/7. It defies logic to suggest that Sheetz's proposed 24/7 operation is inconsistent with the use and character of an area that freely permits 24/7 operation.

{¶ 40} The record contains substantial, reliable, and probative evidence demonstrating that Sheetz's proposed development complements and is consistent with the existing use and character of the surrounding properties. Any contrary conclusion would be so at odds with the evidence as to be erroneous as a matter of law and, therefore, an abuse of discretion. Although our analysis differs somewhat from the trial court's, it ultimately reached the correct legal conclusion, as a matter of law, when it found that that Sheetz's "intent to operate its business 24/7 cannot be used as a basis for the City Council to determine the proposed use is inconsistent with use and character of the surrounding properties or non-compliant with Article 5.09(N)(2)(d) of the UDO." Trial Court's January 7, 2025 Decision, p. 14.

{¶ 41} We reach the same conclusion regarding Sheetz's facility being the only auto-oriented use south of Fireside Drive. Graceworks contends the trial court incorrectly defined the relevant "surrounding properties." It argues that the trial court then impermissibly rejected the City Council's definition of an "auto-oriented" use and substituted its own definition. Finally, Graceworks claims the record does support the City Council's determination that

Sheetz's facility would be the only auto-oriented use south of Fireside Drive, thereby making the proposed development inconsistent with the surrounding properties.

{¶ 42} As noted above, the City Council cited Sheetz's status as the only auto-oriented use south of Fireside Drive as a second reason to find the proposed development inconsistent with the use and character of surrounding properties. The UDO does not define an "auto-oriented use." The Planning Commission coined that phrase when addressing Sheetz's proposed facility. The City Council used it to mean "a business with a drive-thru service or services for motor vehicles such as gas stations, car washes, or repair shops, i.e., places that provide service directly to the automobile or to the occupants of automobiles."

{¶ 43} The trial court rejected the City Council's definition of an auto-oriented use, electing instead to apply UDO 11.02's definition of "Automobile Dependent Uses or Activities." That definition included "land uses that contain automobiles and/or motor vehicles as integral parts of the uses." Ultimately, however, the trial court concluded that under either definition Sheetz's proposed development would not be the only auto-oriented use among the surrounding properties or south of Fireside Drive. Therefore, the trial court rejected the City Council's disapproval of the appellees' site-plan application, finding the City Council's decision unsupported by the evidence.

{¶ 44} Upon review, we see no error in this aspect of the trial court's ruling. As for Graceworks' argument regarding the pertinent surrounding properties, we fully addressed that issue above. Included within the relevant 500-foot radius are a drive-through restaurant, a car wash, and a car dealership providing repair and maintenance services. Under any reasonable definition, including the ones adopted by the trial court and the City Council, these businesses qualify as auto-oriented uses.

21

**{¶ 45}** Even if Sheetz's facility would be the only auto-oriented use south of Fireside Drive, as Graceworks contends, we fail to see the significance of that distinction. Given that we have defined "surrounding properties" to mean everything within 500 feet of the subject property, the proper inquiry is whether Sheetz's proposed facility would be the only auto-oriented use in that geographical area, not whether the facility would be the only such use south of an arbitrary boundary. Determining whether two things are consistent involves a process of comparison within a specific context, making the word "consistent" a relative term. There are myriad ways non-identical things may be consistent or inconsistent with each other. The City Council cannot seize on an inconsequential inconsistency such as the proposed facility being the only auto-oriented use south of a random boundary or landmark, declare an allowed use inconsistent with the area on that basis, and deny site-plan approval.

**{¶ 46}** We recognize the inherent difficulty in determining whether Sheetz's proposed facility is consistent with the use and character of a mixed-use area where at least three zoning districts converge and where there are competing commercial, residential, institutional, and religious uses. The required analysis involves discerning a predominate "use and character" in a geographical area lacking a unifying theme. Given that the 500-foot radius around the subject property is a conglomeration of dissimilar uses, any proposed use could be declared inconsistent with the area on some basis. The attorney for Sheetz made this point at the hearing before the City Council. He opined that modern zoning codes are filled with "waffle language" effectively enabling municipal authorities to make subjective decisions. *See* October 9-10, 2023 Hearing Tr. 202. Sheetz's attorney observed that he "could differentiate probably every use" in the relevant area by "something." *Id*. at 230. For the City Council to reject Sheetz's proposed development, however, the UDO implicitly

22

required some material inconsistency with the use and character of surrounding properties. For the reasons set forth above, the second assignment of error is overruled.

{¶ 47} Graceworks' third assignment of error states:

**The Trial Court erred in reversing the City Council's decision denying a major site plan application where the application failed to satisfy the Standards for Approval enumerated in Section 5.09(N)(2) of Centerville's Unified Development Ordinance.**

{¶ 48} Graceworks argues that the trial court should have affirmed the City Council's denial of site-plan approval based on Sheetz's failure to satisfy two additional criteria in UDO 5.09(N)(2). First, Graceworks contends the proposed development does not adequately protect "other property or residential uses located on the same property from the potential adverse effects of a non-residential use," as required by UDO 5.09(N)(2)(c). Second, Graceworks claims the proposed development neither provides "safe conditions for pedestrians or motorists" nor prevents "the dangerous arrangement of pedestrian and vehicular ways," as required by UDO 5.09(N)(2)(e).

{¶ 49} We find Graceworks' arguments to be unpersuasive. During the City Council hearing, City Planner Ian Vanness stated that the first provision, UDO 5.09(N)(2)(c), did not apply. Vanness opined that subsection (c) applied only to a "multi-tenant property" with other uses on the same lot. *See* October 9-10, 2023 Hearing Tr. 65. The City's attorney agreed. *Id*. at 66. Conversely, counsel for Graceworks asserted that UDO 5.09(N)(2)(c) did apply to Sheetz's proposed use. As applicable here, however, Graceworks' attorney acknowledged that the subsection (c) analysis was subsumed by UDO 5.09(N)(2)(d), which required considering whether the proposed use was consistent with the use and character of surrounding properties. Therefore, Graceworks' attorney found the use-and-character

23

analysis under R.C. 5.09(N)(2)(d) equally dispositive of R.C. 5.09(N)(2)(c). *Id*. at 129. Insofar as Graceworks argued below that subsection (c) and subsection (d) were co-extensive, we have no occasion to address subsection (c) separately. Our use-and-character analysis above adequately covered the issue.

{¶ 50} Regarding R.C. 5.09(N)(2)(e), Graceworks did address that provision before the City Council. It primarily challenged the adequacy of a traffic study that had been performed as part of Sheetz's site-plan application. In its decision reversing the Planning Commission's approval, however, the City Council made no findings under R.C. 5.09(N)(2)(e) and did not rely on that provision to deny the application.

{¶ 51} In its subsequent appeal to the trial court, Graceworks very briefly addressed R.C. 5.09(N)(2)(e) as an alternative basis for upholding the City Council's decision. It asserted "that the Proposed Development will result in increased traffic and increased danger for the residents, employees, and visitors of Graceworks, and that the Application did not account for those increased risks beyond ensuring that emergency vehicles would be able to reach Appellants' property." Graceworks also argued that Sheetz's traffic study did not "address existing traffic issues that affect Graceworks, such as the frequent accidents caused due to motorist confusion at the offset meeting point of Bethany Village Drive and Fireside Drive at Far Hills Avenue." Graceworks maintained that the subject area was already dangerous and that additional traffic would exacerbate the situation for pedestrians.

{¶ 52} The trial court characterized the foregoing concerns as unfounded, being largely speculative and unsupported by any reliable evidence. The trial court also noted that neither the Planning Commission nor the City Council had made any adverse findings regarding Sheetz's impact on pedestrian or motorist safety.

24

**{¶ 53}** We see no error in the trial court's analysis of R.C. 5.09(N)(2)(e). The record reflects that Planning Commission staff fully considered pedestrian and motorist safety. In unanimously approving Sheetz's application, the Planning Commission mandated improvements to alleviate concerns. Notable requirements to the area included widening the roadway, adding a turn lane, upgrading a traffic signal, relocating a sidewalk, adding a separate walkway, and reconfiguring and improving Espanola Trail.

**{¶ 54}** While virtually any commercial development increases traffic flow and creates some theoretical or incremental risk to public safety, the question under R.C. 5.09(N)(2)(e) was whether Sheetz's site-plan application created "safe conditions for pedestrians or motorists" and prevented "the dangerous arrangement of pedestrian and vehicular ways." The trial court reasonably found these requirements satisfied. Notwithstanding concerns voiced by area residents before the City Council, we do not find, as a matter of law, that the preponderance of the reliable, probative, and substantial evidence failed to support the trial court's rejection of Graceworks' argument about pedestrian and motorist safety in relation to its facility, which sits on the opposite side of Far Hills Avenue across from the subject property. Accordingly, the third assignment of error is overruled.

### III. Conclusion

**{¶ 55}** The judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J., and HANSEMAN, J., concur.

25